**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    **Plaintiff,**<br><br>  **v.**<br><br>STEVEN HEMPFLING, d/b/a FREE<br>ENTERPRISE SOCIETY,<br><br>                    **Defendant.** | 1:05-cv-00594  OWW SMS<br><br>**MEMORANDUM DECISION AND<br>ORDER DENYING DEFENDANT'S<br>MOTIONS TO DISMISS (DOC. 43)<br>AND TO STRIKE (DOC. 44)AND<br>SETTING SCHEDULING<br>CONFERENCE**<br><br>**SCHEDULING CONFERENCE DATE:<br>March 23, 2006 8:45 a.m.** |

**I.   INTRODUCTION**

Plaintiff, the United States of America, brings this civil action to permanently enjoin Defendant Steven Hempfling, d/b/a the Free Enterprise Society ("Defendant" or "Hempfling"), from engaging in conduct allegedly in violation of the internal revenue laws. (*See* Compl., Doc. 39.)  Defendant moves to dismiss Plaintiff's claims on the grounds that (i) the complaint does not allege fraudulent conduct with sufficient specificity; (ii) adjudication of the government's claims would require analysis of an issue that is non-justiciable; (iii) the claims impose an impermissible conclusive presumption against Hempfling, and (iv) the conduct is protected by the First Amendment.  (Doc. 43.) Defendant also moves to strike certain portions of the complaint that make reference to the Declaration of Barbara Cantrell because that declaration is not attached to the amended complaint.  (Doc. 44.)[1]

---

[1]    Plaintiff further requests that the court take judicial notice of various pleadings from *United States v. William J.*

**1**

1

## II.  PROCEDURAL HISTORY

2    On May 2, 2005, the Government filed a complaint against

3 Defendant pursuant to 26 U.S.C. § 7402(a) and § 7408, seeking to

4 permanently to enjoin him from violating and interfering with the

5 administration of the internal revenue laws.  (Doc. 1, Compl.)

6 Defendant, initially proceeding *pro se*, filed his "Motion to

7 Dismiss or in the alternative for Summary Judgment" on June 29,

8 2005.  (Doc. 8, Def.'s Mem.; *see also* Doc. 7, Motion; Doc. 9,

9 Hempfling Decl.)  Defendant then acquired legal representation.

10 (Doc. 29, filed August 3, 2005.)

11    Defendant initially moved to dismiss the Government's

12 complaint on the ground that it did not state a claim under any

13 of the potentially applicable internal revenue code sections.

14 Defendant also maintained that the complaint failed to plead

15 fraud with sufficient specificity as is required by Federal Rule

16 of Civil Procedure 9(b).  Finally, Defendant argued that the

17 Government should be equitably estopped from bringing this case

18 against him.  The estoppel argument was construed as a motion for

19 summary judgment.  Oral argument was heard on September 12, 2005.

20    By memorandum order dated September 23, 2005, Defendant's

21 estoppel argument was rejected.  Defendant's motion to dismiss

22 was denied on all grounds, except on the Rule 9(b) ground.

23 Specifically, the district court reasoned:

24

25

26 *Benson*, 1:04-cv-07403 (N.D. Ill.).  (Doc. 50.)  These court
records are subject to judicial notice under Federal Rule of
27 Evidence 201.  *See Kourtis v. Cameron*, 419 F.3d 989, 995 n.3 (9th
Cir. 2005.)  Plaintiff's request is granted.

28

**2**

Here, the Government bases its § 6700 claim on
allegedly false and fraudulent statements by Plaintiff
at seminars, on his website, and in his commercial tax
products...Allegations of fraud must include the time,
place, and nature of the fraudulent statements,
including reasons why the statements are false. The
claims must include the "the who, what, when, where,
and how" of the allegedly fraudulent conduct so that
the Defendant may adequately defend against the
allegations. Defendant does not dispute that the
Government's complaint adequately pleads the "who an
what." The Government's complaint sufficiently alleges
that it was Plaintiff who made the allegedly false
statements to individuals who participated in his
seminars, visited his website
(www.freeenterprisesociety.com), and purchased his
commercial tax products. In addition, Defendant's
complaint contains sufficient allegations of examples
of the content of the allegedly false statements.

Defendant argues that the Government fails to allege
the"when, where, and how." Taking the last question
first, the Government's complaint sufficiently alleges
the reasons why Defendant's allegedly false statements
are false. Defendant's statements, including those to
the effect that there is no requirement to pay income
tax, IRS liens are unenforceable, and that a sufficient
"good-faith" defense can be established if Defendant's
advice is followed, and the Sixteenth Amendment was
never ratified are false and misleading.

Defendant is correct, however, that Plaintiff's
complaint fails to allege where or when the seminars
took place and the commercial tax products were sold.
While Rule 9(b)'s particularity requirement is not as
stringently applied where fraud is alleged to have
occurred over a longer period of time, Plaintiff's
complaint lacks even a range of dates during which
Plaintiff held his seminars, posted information on his
website, and sold his products. Allegations of the
location of the seminars would also serve Rule 9(b)'s
purpose to protect Defendant against the potential
"pretext for the discovery of unknown wrongs."

(Doc. 37 at 13-15 (internal citations omitted)(emphasis added).)

The complaint was dismissed with leave to amend in accordance

with the above reasoning.  (*Id.*)

//

//

//

**3**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.   **FACTUAL BACKGROUND**

The facts as alleged in the complaint are taken as true for the purpose of a motion to dismiss. *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).

The Government's claims arise out of various activities by Defendant, including but not limited to conducting seminars, selling commercial tax products, charging membership fees in the "Free Enterprise Society" (which has optional membership fees for a "civil support service" and a "legal defense fund"), and posting advertisements for his commercial tax products on his website (www.freeenterprisesociety.com). (*Id*. at ¶¶ 8-11, 15.) Through these activities, the Government alleges that Defendant "falsely purport[s] to demonstrate that: (1) there is no law requiring individuals to file federal income tax returns or pay income taxes; and (2) if Hempfling's customers choose to stop filing tax returns, then Hempfling's 'Reliance 2000' package would defeat any charge of willful failure to file a tax return."[2]   (*Id*. at ¶9.)

_____

[2] Specific examples of fraudulent statements made by Hempfling in his commercial tax products (including the Reliance 2000 package, the W4 package, and seminar materials) include:

a.   "There is **No Law** that Requires an Individual to file income tax returns."  (2005 seminar flyer, emphasis supplied)

b.   "The income tax has never been anything but voluntary."  (website description of Seminar 1)

c.   "Over 1500 Reasons Why It May No [sic] Be A Good Idea To File INCOME Tax Returns.  The Choice Is Yours."  (website description of Seminar 8901)

**4**

Hempfling offers a "Reliance 2000" program that the Government claims is used to facilitate, encourage, and assist Hempfling's customers to commit willful failure to file an income tax return. (*Id*. at ¶12)  The "Reliance 2000" Program has four steps:  (1) buy (for $80) and read a two-volume book by William "Bill" Benson titled *The Law That Never Was*, which falsely concludes that the Sixteenth Amendment was never ratified; (2) buy (for $250) The *16th Amendment Reliance Package* from Hempfling, which contains the "initial research" for Benson's book; (3) buy (for $50-75) and send Hempfling's Redress of *Grievance Letter Package* to the President, congressmen, and senators, which asks the recipients to answer questions about the ratification of the Sixteenth Amendment; and (4) buy (for $150 and up) and file Hempfling's federal lawsuit package "asking for

---

    d.    "IRS Liens and Levies Are Unenforceable."
           (website description of Seminar 9201)

    e.    "[The Reliance 2000 package] will help stop
           Failure to File charges, and if charged, will make
           a very formidable defense."  (website description
           of Reliance 2000)

    f.    "[The procedure set out in the W4 Alternative
           Withholding Package] can mean more take home pay
           as this procedure stops the federal withholding
           from your paycheck."  (description of W-4 package)

    g.    "The above programs are designed for income tax
           filers or non-filers alike.  For non-filers these
           programs are **essential to respond legally to the
           taxing agencies**."  (membership information,
           emphasis supplied)

(Compl. ¶18)

an answer to the 16th Amendment question"). (*Id.*)

Furthermore, Hempfling advises his customers to purchase his Reliance 2000 program, take these four steps, and stop filing tax returns, in order to later be able to raise a good-faith defense against tax evasion. (*Id.* at ¶13.) Hempfling bases his advice on the United Supreme Court's decision in *United States v. Cheek*, 498 U.S. 192, 203 (1991), which held that an honest, good-faith belief, no matter how unreasonable, that one was not required to pay taxes or to file a tax return could defeat a "willfulness" finding. The Government alleges that "in essence, Hempfling's Reliance 2000 program is a ready-made--and entirely fraudulent-- *Cheek* defense." (*Id.*)

Hempfling runs a club or organization called the "Free Enterprise Society," through which he promotes his commercial tax products (including "Reliance 2000" as well as a "W4 Package") and for which membership costs $45 per year. Members may attend seminars at no additional charge. (*Id.*)

Members of the Free Enterprise Society may join the "civil support service" for an additional $20 per year, not including additional fees for letter-writing, brief-writing, and other one-on-one services. (*Id.* at ¶ 10.) Members may also join (for $950 for the first year and $300 for each additional year) the "legal defense fund," which is described by Hempfling "as protection for those who have chosen to take the 'political stand' that they are not required to file federal income tax returns." (*Id.* at ¶10.) Hempfling promises to pay for fund members' legal representation. (*Id.* at ¶ 14.) The Government further alleges that "the legal defense fund also facilitates, encourages, and assists

**6**

Hempfling's customers to evade the payment of federal income taxes." (*Id*. at ¶11.)

Plaintiff also has a website (www.freeenterprisesociety.com) on which he sells the same commercial tax products described above, as well as books and other materials. (*Id*. at ¶15.) The Government seeks only to enjoin Hempfling from advertising or distributing those materials that are subject to penalties under § 6700 or § 6701. (*Id*. at ¶17.)

## IV.   STANDARD OF REVIEW

### A.   Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to attack a complaint for failure to state a claim upon which relief can be granted. A Rule 12(b)(6) motion is disfavored and rarely granted: "[a] complaint should not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Van Buskirk v. CNN, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) (citations omitted). In deciding whether to grant a motion to dismiss, the court "accept[s] all factual allegations of the complaint as true and draw[s] all reasonable inferences in favor of the nonmoving party." *TwoRivers*, 174 F.3d at 991.

"The court need not, however, accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*,

266 F.3d 979, 988 (9th Cir. 2001) (citations omitted).  For

example, matters of public record may be considered under Fed. R.

Civ. P. 201, including pleadings, orders and other papers filed

with the court or records of administrative bodies.  *See Lee v.*

*City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).

Conclusions of law, conclusory allegations, unreasonable

inferences, or unwarranted deductions of fact need not be

accepted.  *See Western Mining Council v. Watt*, 643 F.2d 618, 624

(9th Cir. 1981).


**B.    Pleading Fraud Under Federal Rule of Civil Procedure**
**9(b).**

Rule 9(b) of the Federal Rules of Civil Procedure states

that:

> In all averments of fraud or mistake, the
> circumstances constituting fraud or mistake
> shall be stated with particularity.  Malice,
> intent, knowledge, and other condition of
> mind of a person may be averred generally.

A complaint alleging fraud meets the Rule 9(b) standard if it

alleges the time, place, and content of the fraudulent

statements, including reasons why the statements are false.  *In*

*re GlenFed., Inc., Securities Litig.*, 42 F.3d 1541, 1547-48 (9th

Cir. 1994) (en banc), *rev'd on other grounds*, 60 F.3d 591 (9th

Cir. 1995).  Where fraud allegedly occurred over a period of

time, however, Rule 9(b)'s requirement that the circumstances of

fraud to be stated with particularity are less stringently

applied.  *See Fujisawa Pharm. Co., Ltd. v. Kapoor*, 814 F. Supp.

720, 726 (N.D. Ill. 1993); United States *ex rel. Semtner v. Med.*

*Consultants, Inc.*, 170 F.R.D. 490, 497 (W.D. Okla. 1997).

**8**

One of the purposes behind Rule 9(b)'s heightened pleading requirement is to put defendants on notice of the specific fraudulent conduct in order to enable them to adequately defend against such allegations. *See In re Stac Elec. Litig.*, 89 F.3d 1399, 1405 (9th Cir. 1996). Furthermore, Rule 9(b) serves "to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis." *Id.*

## V.   DISCUSSION

### A.   Statutory Background.

The United States seeks an injunction against Defendant under sections 6700 and 7408 of the Internal Revenue Code, 28 U.S.C. §§ 6700, 7408 [IRC §§ 6700, 7408].

> Congress added the statutory provisions that apply to this litigation, I.R.C. Sections 6700 and 7408, as part of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA").The government must prove five elements to obtain an injunction under these statutes:
>
> (1)   the defendants organized or sold, or participated in the organization or sale of, an entity, plan, or arrangement;
>
> (2)   they made or caused to be made, false or fraudulent statements concerning the tax benefits to be derived from the entity, plan, or arrangement;
>
> (3)   they knew or had reason to know that the statements were false or fraudulent;
>
> (4)   the false or fraudulent statements pertained to a material matter; and
>
> (5)   an injunction is necessary to prevent recurrence of this conduct. I.R.C. §§ 6700(a), 7408(b).

**9**

The government bears the burden of proving each element by a preponderance of the evidence. The traditional requirements for equitable relief need not be satisfied since Section 7408 expressly authorizes the issuance of an injunction.

*United States v. Estate Preservation Serv.*, 202 F.3d 1093, 1098 (9th Cir. 2000) (internal citations omitted).

**B.   Compliance with Fed. R. Civ. P. 9(b)**.

The initial complaint was dismissed with leave to amend on the ground that the allegations of fraud were not pled with sufficient specificity;

...Plaintiff's complaint fails to allege <u>where or when</u> the seminars took place and the commercial tax products [that] were sold. While Rule 9(b)'s particularity requirement is not as stringently applied where fraud is alleged to have occurred over a longer period of time, Plaintiff's complaint lacks even a <u>range of dates</u> during which Plaintiff held his seminars, posted information on his website, and sold his products. Allegations of the location of the seminars would also serve Rule 9(b)'s purpose to protect Defendant against the potential "pretext for the discovery of unknown wrongs."

(Doc. 37 at 15 (emphasis added).)

Plaintiff then filed an amended complaint.  (Doc. 39.) Defendant argues that the amended allegations are still not specific enough to satisfy the requirements of Rule 9(b). Defendant first argues that the "amended complaint only contains some very general time-frames (month and year), and only identifies some very general cites as the locations."  (Doc. 43 at 2.)

But, here, the fraud allegedly occurred over a period of time.  In such circumstances Rule 9(b)'s particularity requirement is less stringently applied.  *See Fujisawa*, 814 F.

**10**

Supp. at 726; *Semtner,* 170 F.R.D. at 497.  The complaint alleges generally that the fraudulent conduct occurred between 2003 and 2005 (Compl. at ¶5), and sets forth specific dates on which Hempfling conducted-tax related seminars.

> Hempfling, operating under the name "Free Enterprise Society," conducts tax-related seminars.  These include the seminars conducted by defendant in <u>November of 2003 in Fresno, Santa Clara and Sacramento, California,</u> and in <u>Costa Mesa, San Diego and North Hollywood, California, in December of 2003</u>. Hempfling also promoted his commercial tax products at the <u>2004 Tax Freedom Rally that was held on August 28 and 29, 2004 in Sunnyvale, California</u>.

(*Id.* at ¶8 (emphasis added).)  At these seminars "and continuing to the present day," it is alleged that Hempfling promoted commercial tax products, which "falsely represent or purport to demonstrate that: (1) there is no law requiring individuals to file federal income tax returns or pay income taxes; and (2) if Hempfling's customers choose to stop filing tax returns, then Hempfling's Reliance 2000 program would defeat any charge of willful failure to file a tax return."  (*Id.* at ¶9.)

The complaint also alleges that "[s]ince 2004 (and continuing to the present)," Hempfling promoted and offered various memberships and services, for which he charged fees. Specifically, these memberships were promoted and offered for sale at the "2004 Tax Freedom Rally that was held on August 28 and 29, 2004 in Sunnyvale, California."  (*Id.* at ¶11.)  Also offered for sale at his seminars, including at those seminars specifically described in paragraph 8 of the Complaint, was Hempfling's "Reliance 2000" program.  The complaint alleges that this program "is used to facilitate, encourage and assist Hempfling's customers to willfully fail to file federal tax

**11**

returns and evade federal taxes." (*Id*. at ¶12.).  Moreover,
"[t]hrough advertising and on his website
(www.freeenterprisesociety.com), between 2003 and 2005 (and at
other times that will be ascertained through discovery),
Hempfling sells the same commercial tax products and services
described above, in addition to books and other materials." (Id.
at ¶15.)  These allegations give Defendant adequate notice of the
"specific fraudulent conduct" of which he is accused and enable
him to "adequately defend against such allegations." *Stac Elec.
Litig.*, 89 F.3d at 1405.

Defendant further argues that "the complaint fails to allege
any sales of anything."  This is not an accurate portrayal of the
complaint, which specifically alleges that "on or about July 20,
2005," Barbara Cantrell printed out a copy of the "Information
Package and Freedom Library" for sale at
www.freeenterprisesociety.com.  (Compl. at ¶15.)  This library
"describes in detail the commercial products and services that
Hempfling has promoted and offered for sale from 2003 to the
present."[3]  "On or about January 5, 2005," Barbara Cantrell
ordered three commercial tax products from Hempfling's Free
Enterprise Society:(a) the "W4 Alternative Withholding Package"
(price: $50); (b) the "IRS Lien and Levy Package" (price: $50);
and (c) the "All Seminar Set: Sem 15 July 2004" (price: $195).
(*Id*. at ¶16.)

Defendant next objects that the "complaint does not allege

---

[3]    These paragraphs are subject to the motion to strike,
which is denied as discussed infra at Part V.D.

**12**

1  that Hempfling himself made any false/fraudulent statements at

2  any of the dates or locations specified in the complaint."

3  Specifically, Hempfling points to paragraph 9 of the complaint

4  which refers to "previously recorded seminars."  Hempfling

5  asserts that these "previously recorded seminars" are the only

6  "commercial tax products" alleged to have been promoted or

7  distributed at the seminars.  Again, this is not a fair reading

8  of the complaint.  Paragraph 9 alleges in its entirety:

> 9.   At the seminars mentioned above, and continuing to the
> present day, Hempfling promotes his commercial tax
> products. <u>These include Hempfling's previously recorded
> seminars, W4 package, the IRS lien and levy package,
> and the "Reliance 2000" program</u>. These commercial tax
> products falsely represent or purport to demonstrate
> that: (1) there is no law requiring individuals to file
> federal income tax returns or pay income taxes; and (2)
> if Hempfling's customers choose to stop filing tax
> returns, then Hempfling's "Reliance 2000" program would
> defeat any charge of willful failure to file a tax
> return. Hempfling, through the internet and seminars
> conducted by the "Free Enterprise Society," as
> identified above, also offers a "civil support service"
> which entitles members to obtain – for additional fees
> – customized tax related legal briefs and
> correspondence, and a "legal defense fund" for
> nonfilers that provides those charged with the willful
> failure to file federal income tax returns with
> behind-the-scenes assistance from the Free Enterprise
> Society and, if necessary, legal representation.

20  (*Id*. at ¶9. (emphasis added).)  Contrary to Defendant's

21  assertions, this paragraph does not restrict the category of

22  "commercial tax products" promoted at the seminars to the

23  "previously recorded seminars."  Rather, it makes specific

24  reference to other products.  In addition, this paragraph plainly

25  alleges that these products contain false representations.

26      Defendant further argues that "there is no specific

27  allegation that [Hempfling] actually participated in any such

28  seminars."  Although technically correct, his participation,

**13**

either directly or indirectly in organizing, promoting, and running the seminars is impliedly alleged.

Defendant then takes this argument one step further:

> If it is the government's contention that the "products" contain the "false/fraudulent" statements, then the face of the amended complaint itself shows the dates alleged for any fraud claim simply cannot be correct. Since the complaint specifies the "products in question were "previously recorded" and there are no allegations that Hempfling made any false-fraudulent statements at the general dates and locations alleged in the complaint, then the actual dates of the alleged false/fraudulent "previously recorded" statements could not possibly be the dates or locations identified in the complaint.

(Doc. 43 at ¶3.)

The government responds by emphasizing the statutory provision upon which this fraud claim is based. Section 6700(a)(2) of the Code penalizes any person "who makes or furnishes or causes another person to make or furnish...(A) a statement with respect to...the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter..." IRC § 6700(a)(2)(A). The plain language of this provision does not require that the allegedly fraudulent statement be authored on the dates alleged in the complaint. Rather, it is enough if the Defendant "furnishes" or "causes another person to...furnish" such a false statement at the seminars. No more is required under the statute or under Rule 9(b).

This reasoning also disposes of Defendants alternative argument based upon *Alan Neuman Productions, Inc. v. Albright*, 862 F.2d 1388, 1392 (9th Cir. 1988). Defendant argues that the

**14**

commercial tax products allegedly promoted and sold at the seminars and on the internet were authored by William "Bill" Benson, not Hempfling.  Hempfling asserts that he should not be held liable for the "alleged misrepresentations written in a book authored by someone else."  The United States does not allege that Hempfling authored all of the allegedly fraudulent documents, but the United States does allege that Hempfling furnished those materials to others.  No more is needed to survive this motion to dismiss.[4]

**C.   Jurisdictional Arguments.**

**1.   Subject Matter Jurisdiction Over Dispute Regarding Ratification of the Sixteenth Amendment.**

Defendant dedicates approximately eleven (11) pages of his motion to a novel but unpersuasive argument.  Hempfling insists that subject matter jurisdiction is lacking because the nature of the government's fraud allegations would require this court to determine whether the Sixteenth Amendment was properly ratified.  More specifically, Defendant argues that his opinions regarding the federal income tax are based upon "reserch performed and published by the accomplished authors William J. Benson and M.J. 'Red' Beckman, which factually unrefuted, concludes that the Sixteenth Amendment was not ratified."  (Doc. 43 at 8.)  Therefore, Hempfling insists that, in order to establish liability here, the Government must "prove that the Sixteenth

---

[4]   Hempfling's related argument raised in the context of a defense based upon the First Amendment is discussed infra at Part V.C.2.

1   Amendment was properly ratified." (*Id.*)  Defendant further

2   asserts that "[a] review of the case law shows there is unanimous

3   judicial concurrence that the courts of the United States are

4   absolutely precluded from addressing this issue" (i.e., the

5   validity of the Sixteenth Amendment).  (*Id.*)

6       First, it is ironic that the emphasis Defendant places upon

7   this non-justiciability argument would cause anyone who

8   participated in the "Reliance 2000" Program to question the

9   fourth step, which is to "Purchas[e](for $150 and up) and fil[e]

10  Hempfling's federal lawsuit package 'asking for an answer to the

11  16th Amendment question.'" (Compl. at ¶12.)  Hempfling's

12  customers may find some solace in the fact that Defendant's non-

13  justiciability defense is meritless.  The validity of the

14  Sixteenth Amendment has long been established.

15          For over 75 years, the Supreme Court and the lower
            federal courts have both implicitly and explicitly
16          recognized the Sixteenth Amendment's authorization of a
            non-apportioned direct income tax on United States
17          citizens residing in the United States and thus the
            validity of the federal income tax laws as applied to
18          such citizens. [Citing numerous cases.]

19  *In re Becraft*, 885 F.2d 547, 548 (9th Cir. 1989).  Defendant

20  attempts to distinguish this line of cases on the ground that the

21  specific issue of "apportionment" is not raised by the complaint.

22  (Doc. 52, Deft's Reply, at 7 n.6.)  But the holding from *In re*

23  *Becraft* cannot be construed so narrowly.  It stands for the

24  general proposition that the <u>validity</u> of the Sixteenth Amendment

25  unequivocally is settled law.

26      Defendant points to several cases specifically concerned

27  with the validity of the ratification process, placing particular

28  emphasis on discussions within these cases of justiciability

**16**

doctrines.  But, Defendant chooses to ignore that these cases universally uphold the validity of the Sixteenth Amendment and the ratification process.  For example, Defendant quotes at length from *United States v. Thomas*, 788 F.2d 1250, 1254 (7th Cir. 1986), which addresses the argument of a tax protestor who maintained "that he did not need to file tax returns because the sixteenth amendment is not part of the constitution."

> It was not properly ratified, Thomas insists, repeating the argument of W. Benson & M. Beckman, The Law That Never Was (1985). Benson and Beckman review the documents concerning the states' ratification of the sixteenth amendment and conclude that only four states ratified the sixteenth amendment; they insist that the official promulgation of that amendment by Secretary of State Knox in 1913 is therefore void.

> Benson and Beckman did not discover anything; they rediscovered something that Secretary Knox considered in 1913. Thirty-eight states ratified the sixteenth amendment, and thirty-seven sent formal instruments of ratification to the Secretary of State. (Minnesota notified the Secretary orally, and additional states ratified later; we consider only those Secretary Knox considered.) Only four instruments repeat the language of the sixteenth amendment exactly as Congress approved it. The others contain errors of diction, capitalization, punctuation, and spelling. The text Congress transmitted to the states was: "The Congress shall have power to lay and collect taxes on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration." Many of the instruments neglected to capitalize "States," and some capitalized other words instead. The instrument from Illinois had "remuneration" in place of "enumeration"; the instrument from Missouri substituted "levy" for "lay"; the instrument from Washington had "income" not "incomes"; others made similar blunders.

> Although Thomas urges us to take the view of several state courts that only agreement on the literal text may make a legal document effective, the Supreme Court follows the "enrolled bill rule." If a legislative document is authenticated in regular form by the appropriate officials, the court treats that document as properly adopted. *Field v. Clark*, 143 U.S. 649 (1892). The principle is equally applicable to

**17**

constitutional amendments. *See Leser v. Garnett*, 258 U.S. 130 (1922), which treats as conclusive the declaration of the Secretary of State that the nineteenth amendment had been adopted. In *United States v. Foster*, 789 F.2d 457, 462-63 & n.6 (7th Cir. 1986), we relied on Leser, as well as on the inconsequential nature of the objections in the face of the 73-year acceptance of the effectiveness of the sixteenth amendment, to reject a claim similar to Thomas's. *See also Coleman v. Miller*, 307 U.S. 433 (1939) (questions about ratification of amendments may be nonjusticiable). Secretary Knox declared that enough states had ratified the sixteenth amendment. The Secretary's decision is not transparently defective. We need not decide when, if ever, such a decision may be reviewed in order to know that Secretary Knox's decision is now beyond review.

(parallel citations omitted).

Defendant also cites *United States v. Stahl*, 792 F.2d 1438, 1440 (9th Cir. 1986), where the Ninth Circuit considered an argument that the Sixteenth Amendment was fraudulently certified. The following reasoning from that case is relevant:

Stahl's claim that ratification of the sixteenth amendment was fraudulently certified constitutes a political question because we could not undertake independent resolution of this issue "without expressing lack of the respect due coordinate branches of government." *Id.* In *Field v. Clark*, 143 U.S. 649 (1892), the Court encountered a claim that a bill had not in fact been passed by Congress. The Court held that when a bill has been signed by the Speaker of the House and by the President of the Senate and has received the President's approval, "its authentication as a bill that has passed Congress should be deemed complete and unimpeachable....The respect due to coequal and independent departments requires the judicial department...to accept, as having passed Congress, all bills authenticated in the manner stated." *Id.* at 672. Significantly, the Court noted the possibility that the Speaker of the House and the President of the Senate could fraudulently impose on the people a bill that was never passed by Congress. But "[j]udicial action based upon such a suggestion is forbidden by the respect due to a coordinate branch of the government." *Id.* at 673.

//

//

**18**

In *Leser*, the Court, confronting the claim that
ratifying resolutions of two states were inoperative,
extended the rule declared in Field to the Secretary of
State's authentication that a constitutional amendment
had been duly ratified. 258 U.S. at 137, 42 S.Ct. at
218. Baker indicates that the application of the
political question doctrine in Leser was demanded by
the respect due coordinate branches. Baker, 369 U.S. at
214.

Stahl's claim falls plainly within the confines of
Leser and Field. Stahl's claim rests on an assertion
that the ratifying resolutions of many states were
inoperative. Since the Secretary of State proclaimed
that the sixteenth amendment had been duly ratified,
this assertion presents a political question under
Leser. Stahl's suggestion of fraud on the part of the
Secretary does not render the question justiciable, for
"[j]udicial action based upon such a suggestion is
forbidden by the respect due to a coordinate branch of
the government." *Field*, 143 U.S. at 673. Moreover, in
Baker, the Court in discussing judicial review of the
ratification process characterized the political
question doctrine as "a tool for maintenance of
governmental order." *Baker*, 369 U.S. at 215.
Consideration of Stahl's contention, 73 years after
certification of the amendment's adoption and after
countless judicial applications, would promote only
disorder. *See United States v. Foster*, 789 F.2d 457,
462-63 (7th Cir. 1986).

We conclude that the Secretary of State's certification
under authority of Congress that the sixteenth
amendment has been ratified by the requisite number of
states and has become part of the Constitution is
conclusive upon the courts.

*Id*. at 1440 (parallel citations omitted).[5]

Defendant asserts that three rules "clearly emerge" from

---

[5]     Defendant focuses on the opening sentence from this
quotation ("Stahl's claim that ratification of the sixteenth
amendment was fraudulently certified constitutes a political
question because we could not undertake independent resolution of
this issue without expressing lack of the respect due coordinate
branches of government") and asserts that this is the holding of
the case.  But, this is a sentence fragment that appears to be
the Ninth Circuit's attempt to restate Stahl's own argument.
This interpretation is confirmed by the final paragraph of the
excerpt which concludes that the ratification of the sixteenth
amendment is "conclusive upon the courts."

**19**

*Thomas* and *Stahl*:

> (1)    the Seventh and Ninth Circuit addressed no issue other than what Secretary Knox himself addressed;

> (2)    that because the Supreme Court follows the "enrolled bill rule," the doctrine of non-justiciable political questions prohibits a court from addressing the issue, and imposes a duty to accept Knox's proclamation that the Sixteenth Amendment was ratified; and

> (3)    that Secretary Knox's decision is now beyond [court] review.

(Doc. 43 at 10.)

Defendant then (in a confusing and unnecessarily indirect manner) makes the remarkable assertion that the line of cases accepting Secretary Knox's proclamation, including *Thomas*, *Stahl*, and others, e.g., *United States v. Benson*, 941 F.2d 598, 607 (7th Cir. 1991), should be <u>disregarded</u> because he possesses evidence of non-ratification that Secretary Knox <u>never considered</u>.  (*Id.* at 13-15.)[6]  But Defendant places too much weight on whether particular pieces of evidence were or were not considered by Secretary Knox.  The cases suggest that such fine line-drawing is not appropriate.  For example, in *United Stats v. Sitka,* 845 F.2d 43, 47 (2d Cir. 1988), the Second Circuit reasoned:

> The Sixteenth Amendment was proposed by Congress and ratified by the states in accordance with procedures set out in Article V of the Constitution, and its ratification was then certified after careful scrutiny by a member of the executive branch acting pursuant to statutory duty. The validity of that process and of the resulting constitutional amendment are no longer open questions.

To accept Hempfling's contrary assertion -- that the question may

---

[6]    Although Defendant describes this new evidence in detail, its substance and nature are not relevant to the instant inquiry.

be re-opened upon the discovery of "new evidence" concerning the ratification -- would fly in the face of the very purpose of the political question doctrine, which serves as "a tool for maintenance of governmental order." *Baker v. Carr*, 369 U.S. 186, 215 (1962).

Defendant's argument that this case is non-justiciable because it concerns the validity of the Sixteenth Amendment is not well founded.  His motion to dismiss on this ground is **DENIED**.

### 2.   Indispensable Party.

Defendant makes a related argument that this case must be dismissed under Federal Rule of Civil Procedure 19 for failure to name an indispensable party, namely the United States Congress. (Doc. 43 at 20-21.)  As discussed, the validity of the Sixteenth Amendment is no longer in question.  Defendant's "new evidence" is not grounds for a court to disregard the line of cases that so hold.  Accordingly, the United States Congress is not an indispensable party to this litigation.  Defendant's motion to dismiss on this ground **DENIED**.

### 3.   Conclusive Presumption.

Similarly, Defendant argues that the cases discussed above "require this court to accept as a conclusive presumption the ratification of the Sixteenth Amendment."  (Doc. 43 at 18 (emphasis added).)  Defendant uses the catch-phrase "conclusive presumption" in an apparent attempt to benefit from a line of Supreme Court cases holding unconstitutional the use of "conclusive presumptions" that operate to take the issue of intent away from a jury "where the intent of the accused is an

ingredient of the crime charged." *See e.g., Sandstrom v. Montana*, 442 U.S. 510, 521-23 (1979); *see also Stanley v. Illinois*, 405 U.S. 645, 654-57 (1972).  This line of cases is simply inapposite here.  Defendant's motion to dismiss on this ground is **DENIED.**

### 4.   Is the Alleged Conduct Protected by the First Amendment?

Throughout his motion to dismiss, Defendant argues that the conduct alleged in the complaint is protected by the First Amendment.  Although much of Defendant's reasoning in support of this argument is contained within the section of his brief attacking the complaint under Rule 9(b) for lack of specificity, it is more appropriate to construe his First Amendment argument as a motion to dismiss for failure to state a claim.

In general, defendant argues that all of the allegedly fraudulent statements are opinions (either his own or those of others) "formed based upon case law created by the United States Circuit Courts and the United States Supreme Court."  (Doc. 43. at 8.)  Defendant insists that "[a] matter of opinion [is] protected by the First Amendment."  (*Id.*)

Defendant's position is untenable.  The Supreme Court has repeatedly held that the First Amendment does not shield fraud. *Madigan v. Telemarketing Assoc., Inc.*, 538 U.S. 600, 612 (2003); *Gertz v. Robert Welch Inc.*, 418 U.S. 323, 340 (1974)(an "intentional lie" plays "no essential part of any exposition of ideas.").

Defendant quotes several general principles of First Amendment jurisprudence that simply do not control the outcome of

22

this case.  For example, Defendant cites *Hudgens v. NLRB*, 424

U.S. 507, 520 (1976) for the proposition that the government may

not "discriminate in the regulation of expression on the basis of

the content of that expression."  First, although the general

proposition quoted in *Hudgens* -- that the government may not

"discriminate in the regulation of expression on the basis of the

content of that expression" -- is valid, it is well settled that

Congress may proscribe fraudulent conduct.

> Where it has been determined that [] statements
> regarding [tax advice], which constitute commercial
> speech, are misleading in the context contemplated by
> Congress in enacting the [sections 6700 and 7408], and
> the injunction prohibiting such statements is
> adequately tailored and construed to enjoin only such
> commercial speech which has been shown to be both
> misleading and likely to promote illegal activity, such
> representations are not protected by the First
> Amendment against restraint authorized by section 7408
> and properly found necessary in the particular case to
> prevent recurrence of the denounced conduct.

*United States v. Estate Preservation Serv.*, 202 F.3d 1093, 1106

(9th Cir. 2000)(citing *United States v. Buttorff*, 761 F.2d 1056,

1066 (5th Cir. 1985)).[7]  Whether the United States can establish

---

[7] Although the *Hudgens* court did discuss this general
principle of First Amendment jurisprudence, the Court then found
that "the constitutional guarantee of free expression has no part
to play" under the facts and circumstances of the *Hudgens* case.
*Id*. at 521.  Hudgens owned a shopping center and harassed
striking members of a union who were picketing in front of their
employer's store, located within Hudgens' shopping center.  The
National Labor Relations Board found that Hudgens' conduct
violated the National Labor Relations act and successfully sought
and enforced an injunction against Hudgens.  In reviewing
Hudgens' appeal from that injunction, the Supreme Court analyzed
whether the First Amendment provided additional protection to the
picketing union members.  After a lengthy discussion, the Supreme
Court decided that the First Amendment <u>did not</u> protect the union.
Rather, the National Labor Relations Act provided the applicable
rules of decision.  This is just one of several instances in

**23**

the elements required for such an injunction to issue remains to be determined at a later stage of the case.

Defendant also attempts to draw a distinction between his conduct and fraud by arguing that the commercial tax products he allegedly promoted and sold were written by another person -- William "Bill" Benson.  Hempfling asserts that he should not be held liable for the "alleged misrepresentations written in a book authored by someone else."  He then argues in a footnote "[i]f the Court wants to go down this road, then every bookstore in America had better start screening every book it sells for 'misrepresentations.'" (Doc. 43 at 5 n.3.)  Defendant provides no support for this proposition, however.  To the contrary, it is well-established that the First Amendment does not protect those who aid and abet criminal conduct by the dissemination of printed materials that incite crimes.  *United States v. Barnett*, 667 F.2d 835, 842-43 (9th Cir. 1982)(First Amendment does not protect dissemination of instructions for the manufacture of controlled substances); *see also Rice v. Paladin Enterprises, Inc.*, 128 F.3d 233 (4th Cir. 1997) (First Amendment does not protect publisher of manual instructing reader how to operate as a "hit man").  If Hempfling knew or had reason to know that the statements contained within the commercial tax products were false and/or fraudulent, he cannot hide behind the First Amendment simply by asserting that he did not author those products himself.  Defendant's motion to dismiss based on the First Amendment is **DENIED.**

---

which counsel for Defendant presents quotes out of context.

### 5.   *Norr-Pennington* Doctrine.

Defendant also maintains that some of the allegedly unlawful conduct described in the complaint is protected by the *Noerr-Pennington* doctrine, which protects the right to petition the government for redress of grievances.   *See Eastern R. Conf. v. Noerr Motors*, 365 U.S. 127 (1961); *Mine Workers v. Pennington*, 381 U.S. 657 (1965).

> Under the *Noerr-Pennington* doctrine, those who petition all departments of the government for redress are generally immune from liability....*Noerr-Pennington* is a label for a form of First Amendment protection; to say that one does not have *Noerr-Pennington* immunity is to conclude that one's petitioning activity is unprotected by the First Amendment.

*Empress LLC v. City and County of San Francisco*, 419 F.3d 1052, 1056-57 (2005)(internal quotations and citations omitted).

The *Noerr-Pennington* doctrine was originally created to immunize individuals and entities from antitrust liability, where the alleged anticompetitive behavior is the filing of a series of lawsuits.[8]   *Id.*   *Noerr-Pennington* was later found to apply to claims brought under § 1983, where the allegedly unlawful act involved petitioning or lobbying the government for the redress of grievances.   *Id.*   Defendant cites no cases which apply *Noerr-Pennington* in factual or legal circumstances similar to this case.   However, even if *Noerr-Pennington* did apply as a general matter to such conduct, there is a "sham" exception to the *Noerr-Pennington* doctrine that is applicable here.   The Ninth Circuit discussed this exception in the context of an anti-trust case in

---

[8]   In this way, the *Noerr-Pennington* doctrine is a cousin to modern Anti-Slapp statutes.

**25**

*Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1060-61

(1998).

> In *Noerr*, the Court acknowledged that "[t]here may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere with the business relationships of a competitor, and the application of the Sherman Act would be justified." 365 U.S. at 144. *In City of Columbia v. Omni Outdoor Advertising*, Inc., 499 U.S. 365 (1991), the Court explained:

>> The "sham" exception to Noerr encompasses situations in which persons use the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. A "sham" situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means. (*Id.* at 380.)

(parallel citations omitted.)   The Ninth Circuit in *Kottle* went on to describe the types of conduct that might constitute a "sham" under various circumstances.

> Although the *Noerr-Pennington* doctrine applies to activities directed at any branch of government, the scope of the sham exception depends on the type of governmental entity involved....When the branch of government involved is a court of law, this circuit recognizes three circumstances in which an antitrust defendant's activities might fall into the sham exception. First, if the alleged anticompetitive behavior consists of bringing a single sham lawsuit (or a small number of such suits), the antitrust plaintiff must demonstrate that the lawsuit was (1) objectively baseless, and (2) a concealed attempt to interfere with the plaintiff's business relationships.

> Second, if the alleged anticompetitive behavior is the filing of a series of lawsuits, the question is not whether any one of them has merit-some may turn out to, just as a matter of chance-but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival.

> Finally, in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.

Id. at 1060 (internal citations and quotations omitted).

The *Kottle* court then cautioned that it might be more difficult to prove that lobbying or petitioning a legislature constituted a "sham."

> It is obvious that these three ways in which litigation might be a sham do not necessarily extend beyond the litigation context. For instance, if the alleged anticompetitive behavior consisted of lobbying a [] legislature (as in Noerr ), rather than filing a suit in [] court, it would seem quite pointless to ask whether the lobbying effort was "objectively baseless." To decide objective baselessness, we would need objective standards, of which there are few, if any, in the political realm of legislation, against which to measure the defendant's conduct.
>
> Similarly, the second and third variants of the litigation sham exception do not make sense in the legislative realm. Subjecting a defendant to antitrust liability because it pursued a pattern of baseless legal claims does not generate the same collateral consequences as subjecting the same defendant to antitrust liability because it engaged in numerous unsuccessful attempts to lobby a [] legislature-the latter would eviscerate the Petition Clause. And the sham exception for intentional fraud on a court cannot lightly be taken to apply in a legislative context because, as the Supreme Court has observed, the political arena has a higher tolerance for outright lies than the judicial arena does.

*Id*. at 1061.  Arguendo, some of the conduct alleged in this case appears to be of this latter variety (i.e., lobbying/petitioning a legislature).  For example, the third step of Hempfling's four-step "Reliance 2000" program is "Purchasing (for $250) from Hempfling the "Redress of Greivance Letter Package," which asks questions about the ratification of the Sixteenth Amendment, and sending it to the president, congressman, and senators.  Upon

closer examination, however, the ultimate objective of this four-step program is to assist an individual's chances of successfully defending against a criminal tax evasion conviction by invoking the so-called "*Cheek*" defense.  As such, Hempfling's "petitioning"-related activities are actually designed to perpetrate a fraud or "sham" against the courts and to encourage criminal tax evasion.  Defendant's motion to dismiss based on the Norr-Pennington doctrine is **DENIED.**  (Hempfling also argues that the "*Cheek*" defense is not a sham.  This argument is discussed and rejected below.)

### 6.    Justiciability of Allegations Concerning the "*Cheek*" Defense.

Finally, Defendant specifically challenges those allegations in the complaint concerning his alleged advocacy of the use of the so-called "*Cheek*" defense.  The "*Cheek*" defense is based upon *United States v. Cheek*, 498 U.S. 192 (1991), in which the Supreme Court held that an honest, good faith belief -- no matter how unreeasonable -- that one was not required to pay taxes or file a tax return defeated a "willfulness" finding in a criminal tax evasion case.  Hempfling argues that it would not be proper for this court to adjudicate the issue of whether advocacy of the use of the *Cheek* defense by third parties (e.g., consumers of the "Reliance 2000 package") constitutes fraud:

> [A]ny consideration of [the "*Cheek* defense" leads to a more fundamental problem since the government is asking this Court to make a ruling and essentially give an 'advisory opinion' on an issue/controversy that is simply not before it (and is probably non-justiciable anyway): the probability that a particular defense will prevail in a hypothetical criminal case. As this Court is most likely aware, giving advisory opinions and rulings on hypothetical cases/situations is strictly

1      forbidden. *Gator.com Corp v L.L. Bean, Inc.*, 398 F.3d
       1125, 1132 (9th Cir. 2005). Federal courts are limited

2      only to adjudicating 'live controversies', not
       hypothetical cases or issues. *Id.* Because the Court

3      cannot even entertain, much less adjudicate, this issue
       in the amended complaint, it cannot form the basis of

4      any claim and should be dismissed.

5 (Doc. 43 at 6-7).)

6    The government does not respond directly to this argument in

7 its opposition.  Critically, however, the allegations in the

8 complaint concerning Hempfling's advocacy of the "*Cheek*" defense

9 cannot be read in a vacuum.  The Government has successfully

10 alleged a violation of the internal revenue code with respect to

11 Hempfling's promotion of the Reliance 2000 package, whereby

12 Hempfling advises and incites individuals to purchase, read, and

13 use a set of materials to criminally violate internal revenue

14 laws and to rely on a *Cheek* defense.  Assuming, arguendo, that

15 the Government is able to ultimately obtain an injunction against

16 Hempfling's promotion of the Reliance 2000 package, Hempfling's

17 future promotion of the "*Cheek*" defense may not have any

18 consequence, because he would not be permitted to offer any

19 products in their present format and substance that provide the

20 basis of an alleged *Cheek* defense.

21

22    **D.** **Motion to Strike**.

23    Hempfling also moves, pursuant to Rule 12(f) and Local Rule

24 15-220, to strike those portions of paragraphs 15 and 16 of the

25 amended complaint which refer to the Declaration of Barbara

26 Cantrell, its contents and exhibits.  (Doc. 44 at 2.)  Hempfling

27 points out that although the declaration "is referred to in the

28 above paragraphs of the complaint, neither it, nor any of its

'exhibits' is attached to the complaint," in contravention of
Local Rule 15-220, which requires that "changed pleadings shall
contain copies of all exhibits referred to in the changed
pleading."

Although Defendant's understanding of the requirements of
Local Rule 15-220 is correct, Plaintiff's failure to attach the
declaration and/or its exhibits to the complaint does not merit
the extreme sanction of striking the relevant portions of
paragraphs 15 and 16.

Pursuant to Federal Rule of Civil Procedure 12(f), a party may
move to strike from any pleading "any redundant, immaterial,
impertinent or scandalous matter."  However, motions to strike are
disfavored and infrequently granted.  *Neveu v. City of Fresno,* 392 F.
Supp. 2d 1159, 1170 (E.D. Cal. 2005) ("[M]otions to strike should not
be granted unless it is clear that the matter to be stricken could
have no possible bearing on the subject matter of the litigation.").

A district court has broad discretion over the application of its
own local rules and it may overlook violations where there is no
indication that the opposing party is <u>prejudiced</u>.  *See Green v. Baca*,
306 F. Supp. 2d 903, 913 n.40 (C.D. Cal. 2004).[9]  Defendant has

---

[9]     Defendant correctly points out that the September 23, 2005
memorandum opinion in this case cited Local Rule 56-260(a)(requiring
the filing of a statement of undisputed fact along with any motion for
summary judgment) in the context of declining to consider certain of
defendant's arguments. (*See* Doc. 37 at 27-28.)  But, Defendant
quotes the court's own language out of context.  The entire
paragraph reads:

In the alternative to his Motion to Dismiss, Defendant
brings a "Motion for Summary Judgment." Defendant argues
that the Government should be estopped from bringing this
action against Defendant based on Defendant's contention

1   made no effort to establish prejudice in any form, perhaps because the

2   referenced Declaration and its exhibits are already part of the

3   record.  (*See* Docs. 13-22, filed July 20, 2005.)

4

5

6                           **VI.   <u>CONCLUSION</u>**

7        For the reasons set forth above:

8   (1)  Defendant's Motion to Dismiss is **DENIED** in its entirety; and

9   (2)  Defendant's Motion to Strike is **DENIED**.

10       A scheduling conference will be held in this matter on

11  March 23, 2006 at 8:45 a.m. before Judge Wanger in Courtroom

12  Three.  A joint scheduling report shall be filed at least three

13  court days prior to the conference.

14

15

16

17  _____

18          that the Government's attorney led him to believe he was not
            violating the law in a July 2004 telephone conversation. In
19          addition, the Government construes two conclusory statements
            in Defendant's declaration a summary judgment motion on the
20          issue of whether Defendant violated § 6700 and § 6701.[7]
            Defendant's estoppel argument can be decided as a matter of
21          law.

22  However, the arguments regarding violations of § 6700 and § 6701
23  will not be considered. <u>Defendant has filed no Statement of
    Undisputed Facts, as is required by LR 56-260(a). Little if any</u>
24  <u>discovery has been conducted in this case. Finally, these issues</u>
    <u>were not presented in a properly noticed summary judgment motion</u>
25  <u>and will therefore not be construed as such</u>.

26  (Id.)  Under such circumstances, the record did not lend itself
27  to resolution on summary judgment.  The absence of a statement of
    undisputed fact was one factor evidencing the paucity of a
28  factual record on the issues presented.

                                **31**

**SO ORDERED**

Dated: February 22, 2006            /s/ OLIVER W. WANGER

**OLIVER W. WANGER
United States District Judge**